**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHARON ELIZABETH KEEGAN, | ) | No.: 4:20-CR-00045-RSB-CLR |
| | ) | |
| DEFENDANT. | ) | |

**DEFENDANT SHARON KEEGAN'S TRIAL MEMORANDUM**

COMES NOW Defendant Sharon Keegan ("Ms. Keegan" or "Sharon"), by and through counsel, and files this her Trial Memorandum, and shows the Court the following:

### I. INTRODUCTION

Congress has mandated that the government prioritize prosecution of sexual exploitation cases to protect victims, especially children, from predators. It cannot be reasonably disputed that J.P. Keegan, Sharon's husband, who has pled guilty to using his own daughter to engage in sexually explicit conduct for the purpose of producing child pornography, is a predator. The question, as it relates to Sharon is whether she is, like her husband, a sexual predator, or whether instead she is in fact, a co-victim, along with her daughter and her sister.

Admittedly, when viewed in isolation, the allegations against Sharon contained in the Indictment lead to a relatively straightforward conclusion: Sharon is a criminal, an active participant in the production of child pornography with her husband. But, when viewed through the lens of a Sharon's relationship with J.P., as a victim, a sex slave of J.P., a different picture emerges: Sharon did not have the *mens rea* to commit the offenses charged; she is actually innocent.

The evidence at trial will establish that Sharon Keegan was the victim of some of the most severe and disturbed acts of domestic rape, violence and psychological torture from her husband, J.P. Keegan. J.P. groomed Sharon, starting when she was 15 years old, to submit to increasingly intrusive, painful and humiliating forms of sexual violence by brainwashing her into falsely believing his behavior was part of a sexual subculture where "domination and submission" was normative rather than a manifestation of his pedophilia, sexual predation and deviance.

Dr. Reynolds will testify that Sharon did not experience these acts of coerced "submissiveness" and violence as sexually arousing. Instead, Sharon demonstrated numerous manifestations of being acutely and chronically traumatized by J.P.'s behavior. According to Dr. Reynolds, Sharon's accommodation and survival strategies are similar to those found in victims of prolonged *torture*. In light of this evidence, the government will not be able to establish beyond a reasonable doubt that Sharon, a "victim [her]self," formed the *mens rea* necessary to commit the offenses charged in Counts Six and Seven.

As to Count Eight, the government may attempt to contextualize its case by introducing its evidence against J.P. including *hundreds* of videos containing suspected child pornography and *thousands* of images depicting suspected child pornography. This evidence includes multiple video-recorded episodes of penetrative rape of at least one toddler. By contrast to this gruesome evidence, the government's *de minimis* evidence against Sharon consists primarily of a handful of photos of Sharon's teenaged sister, including one unposed photo of MV2 showering. Even if the government can establish beyond a reasonable doubt that Sharon possessed images of her sister, the jury must also find, guided by *Dost*, that these images are pornographic.

At the close of evidence, counsel expects to return to where the case against Sharon began: with an interview by Liberty County Sheriff's Office Detective Susan Willis. According to Det.

Willis, "[w]hen I first got here, I assumed you were some kind of victim yourself." By the end of the interview however, Det. Willis was surprised when Sharon did not express surprise and astonishment as Det. Willis expected. A juror that hears only part of the evidence might also be understandably surprised. Here, however, the jury will hear the whole truth and will have an opportunity to see the case through a different lens.

## II.      SUMMARY OF EVIDENCE TO BE PRESENTED AT TRIAL

The investigation that led to this case has its genesis in either an NCMEC CyberTipline Report received October 15, 2019, or an undercover operation led by the National Crime Agency's Specialist Operations Command in the United Kingdom, which was first authorized on July 24, 2019. Regardless of its origin, the investigation was ultimately referred to local investigators within the Liberty County [Georgia] Sheriff's Office. USAO-001201. That local investigation led to a warrant application, and the warrant that issued resulted in the arrest of J.P. Keegan and a search of the Keegans' residence. USAO-001206-07.

Sharon was not a target of the investigation when Detective Willis "came over here [on January 8, 2020 to execute the search warrant]." Sharon Keegan c 01-08-2020.m4a at 30:51. In fact, according to Detective Willis, "[w]hen I first got here, I assumed you were some kind of victim yourself." *Id*. at 37:49. Based on facts described below, Detective Willis's initial assumption was well-placed. Detective Willis also "assumed that [Ms. Keegan] would be surprised and astounded," but was surprised herself when Sharon did not express the emotions Detective Willis expected. *Id*. at 31:15.

During a digital forensic examination ("extraction" or "imaging") of J.P.'s phone, investigators "identified 1300 video files and 13,000 images of suspected child pornography." USAO-001037. These files included a video depicting a child "about 3-5 years old" "being

subjected to anal and vaginal penetration by an adult male's penis," *id.*, as well as a "video that is a 18 second color movie clip showing a naked toddler 4 years old" while "a male [alleged to be J.P. Keegan] begins to rub and digitally penetrat (sic) the vagina of the child" saying "[h]ow's that, how's that feel, feels good?" USAO-001039.

By contrast, the government's best evidence against Sharon is that her phone contained a handful of images that, at most, depict "lascivious exhibition of the genitals." *See* 18 U.S.C. § 2256(2)(A).

With this evidence in hand, the government presented its case against Sharon to the Grand Jury, which returned three counts against Sharon. The Grand Jury did not hear evidence of J.P.'s behavior towards Sharon, which entailed daily, prolonged, physically painful and psychologically powerful forms of torture including the following:

- Repeated vaginal, oral and anal rape of Sharon. (This was not consensual sex.)

- Repeated choking and suffocation to the point where Sharon lost consciousness. (This was done to allow J.P. to rape her in more painful ways without Sharon protesting.)

- Drugging Sharon to induce compliance;

- Using painful instruments to penetrate her orally, vaginally and anally;

- Verbal abuse both during sexual torture and in daily domestic life intended to humiliate and degrade Sharon (e.g., "You stupid little whore, cunt, bitch, etc." "I own you, you are my property, no other man will ever want you, etc.");

- Verbal and emotional abuse towards their children;

- Allowing his father, John, to sexually molest and exploit Sharon in exchange for housing and rent;

- •  Repeatedly telling Sharon that she was his "property" and "punishing" her with the above forms of torture for any signs of resistance, protest or failure to comply; and

- •  Pedophilic grooming of Sharon's sister and their young children to serve his own sexual needs.

*See* Report of Dr. Victoria Reynolds, PhD. *Compare* Grand Jury Transcript.

In Dr. Reynolds' opinion, each of these acts were used by J.P. to increase his sexual arousal and were often administered as "punishments" to Sharon for not obeying J.P. in some other domestic realm. For example, he would "punish" Sharon for not having his dinner ready when he got home from work by whipping her, choking her out and anally raping her or making her wear a "butt plug" around the house. *See id*.

The grand jurors heard no evidence of Sharon's past trauma. At trial however, jurors will hear that Sharon was raped for the first time, in Claxton, Georgia, when she was less than seven years old. She was subsequently passed from one predator to the next until meeting J.P. when she was fifteen years old and a freshman in high school. They began dating on December 3rd of that year. J.P. told Sharon he asked her to be his girlfriend "because he was bored." Consequently they "celebrated" their "Five Month Anniversary" by "losing their virginity to each other." Sharon and J.P. continued to have sex throughout high school, whenever and wherever they could get away, but "usually on the kitchen floor at his dad's house."

Sharon turned eighteen in January 2010 and, and less than a month later, moved in with J.P. at his dad John's house. Around this same time, she became pregnant with her first child. When John discovered that Sharon was pregnant, he immediately demanded that the baby be given up for adoption, but Sharon refused.

For the next eight years, Sharon and J.P. lived with John in Richmond Hill, Georgia. During this period, John coercively controlled Sharon's life in both minor and major ways. For example, if the family was going out to dinner, John would tell Sharon to "stay home and clean the kitchen" because "there aren't enough seatbelts in the car for you to ride with us to the restaurant." But Sharon also did not need a cell phone, according to John, because she "don't need to be talking to anybody." When Sharon became pregnant for a second time—what John referred to as a "f___ up because you're stupid"— John demanded that the baby girl also be given up for adoption. J.P. refused.

A few months later, Sharon became pregnant again (another "f___ up" according to John). Around this time, John drove Sharon to his office in Savannah, where—"because he is the manager, he can turn off the cameras"—he told her "I've been with multiple women, so I need to show you some things you can do for my son."

In 2016, when the third baby was born, John finally succeeded in convincing Sharon that she was "too stupid and useless" to have three kids, so the baby should be "adopted out" to someone from his office. John also insisted that Sharon submit to a tubal ligation or else he would "cause problems" for her. Two and a half months later, Sharon attempted suicide for the first time.

In July 2018, Sharon again planned to attempt suicide but was interrupted and referred for diagnostic assessment and psychiatric evaluation. At intake she told the provider the reason for her visit was that "[m]y father-in-law is really controlling."

In November 2018, Sharon was transferred from Gateway Behavioral Health to Memorial Hospital's Emergency Department after revealing thoughts of suicide. One note described that she had been demonstrating "psychotic behavior, running around naked." Other notes describe her as having "dissociative out of body experiences, loss of memory, not sleeping, extreme anxiety," and

that she was "unable to care for her children (8 and 3 y.o.) due to dissociative state." Notably, these observations from the Emergency Department predate her arrest by a year and some months.

J.P. and Sharon finally moved out of John's house either because they "did not feel safe there anymore" or because J.P. discovered that John had been sexually assaulting Sharon. The couple separated. Sharon and the children moved in with her parents and teenage sister and J.P. moved to his aunt's house.

It is unclear when J.P. resumed assaulting his wife, daughter and sister-in-law, but shortly after the couple separated, J.P. convinced Sharon to allow him to move in with her and the kids at Sharon's parents' trailer in Midway. Around this time, J.P. began asking Sharon to share "deep dark thoughts" with him about ways in which she could "prove her love to him." Part of this "proof" included, without limitation, "choking [her] out" during sex because it was "too rough for [her]" and demanding that Sharon say things like "I'm your stupid worthless little girl."

It escalated from there. Eventually, J.P. gave Sharon three different names based on her behavior. "Liza" was the submissive "sex slave." When playing the role of "Liza," Sharon was only allowed to call J.P. "Master". "Cassie" was the "little" whom Sharon portrayed as a 4- or 5-year-old girl who wore a pacifier, carried a blanket, and was required to call J.P. "Daddy". "Alice" was the name J.P. called Sharon when she was "being mean or 'bitchy.'" He would tell her, "you know I don't like Alice."

During this same period, J.P. began openly flirting with Sharon's sister, telling Sharon, "I like her better than you," and asking her sister, "wouldn't you rather be a girlfriend than a sister?" J.P.'s internet activities, as documented by the undercover officers in the UK, suggest that J.P.'s interest in Sharon's sister extended beyond flirting. He repeatedly bragged online about successfully drugging and raping Sharon's sister, his own daughter, and also Sharon. And he

offered to share: "I can tesch (sic) you how but youll (sic) have to drug em (sic) both if not them plus wife so no one catches and of course I would want pics lol." *See* USAO-000521.[1]

After evaluating Sharon, Dr. Reynolds found that Sharon manifests some of the most severe forms of trauma-related diagnoses, symptoms and behaviors. These include:

- Severe dissociation to the extent of identity fragmentation into dissociative "parts." [This diagnosis is consistent with the chart notes from November 2018.]

- Severe complex posttraumatic stress symptoms. She meets ICD-11 standard criteria for Complex Posttraumatic Stress Disorder (C-PTSD)

- Trauma bonding with the perpetrator, J.P.

- Emotional and physical numbing

- Cognitive and psychological compartmentalization and denial

- Severe depressive symptoms

- Physical injuries including bruising, anal bleeding and tears, chronic hemorrhoids

## III.    ARGUMENT AND CITATION TO AUTHORITY

It is well established that Sharon has a constitutional right to present a complete defense. *U.S. v. Frazier*, 387 F.3d 1244, 1271 (11th Cir. 2004) (citing *Crane v. Kentucky*, 476 U.S. 683 (1986), *California v. Trombetta*, 467 U.S. 479 (1984), *Chambers v. Mississippi*, 410 U.S. 284 (1973)).

---

[1] A necessary but unfortunately graphic example illustrates the point and highlights the coercive nature of J.P.'s control over Sharon during the relevant period. One evening, while J.P. and Sharon were at home in their bedroom, J.P. realized that Sharon's sister was in the shower down the hall. While lying in the bed, he handed Sharon her own phone and demanded that she go into the bathroom and photograph her sister. When Sharon refused, J.P. told her that she needed to be punished. To "punish" Sharon, J.P. demanded that she strip naked and move onto her hands and knees on the bed. J.P. then forcefully sodomized Sharon with an unlubricated hairbrush. He told her she was not allowed to move or remove the hairbrush until she apologized for "disobeying" him.

United States v. Keegan, et al.
U.S. District Court for the Southern District of Georgia

"[D]omestic violence is not an isolated, individual event, but rather a pattern of perpetrator behaviors used against the victim." Anne L. Ganley, *Understanding Domestic Violence*, in *Improving the Health Care Response to Domestic Violence* 18 (Carole Warshaw & Anne L. Ganley eds., 1996). The abusive relationship is defined by a "pattern of coercion and control," Evan Stark, *Re–Presenting Woman Battering: From Battered Woman Syndrome to Coercive Control*, 58 Alb. L. Rev. 973, 975 (1995), such that it may even be said that "the unique profile of [the victim of domestic abuse] arises as much from the deprivation of liberty implied by coercion and control as it does from violence-induced trauma," *id*. at 986. Within this context, the evidence Sharon anticipates introducing at trial is highly probative as to her knowledge and intent, or lack thereof.[2]

Here, Dr. Reynolds reached a finding similar to the one reached by the expert in *López-Correa*, that Sharon's behavior was "highly influenced by a cruel, constant, and intentional pattern of abuse by way of domestic violence and sexual aggression which placed her in a position of defenselessness and inability to control her will." *See López-Correa* at *3. The *López-Correa* expert further opined that "[t]his situation prevented [her] from being able to make decisions in relation t[o] the abuse or for terminating the relationship. She demonstrated low self-esteem, a feeling of impotence, fear of making decisions, terror [of] abandoning the relation[ship] because of the imminence of a violent reaction from Acevedo–Maldonado." *Id*.

---

[2] There are post-verdict implications as well. As the *Dando* court noted, "had counsel investigated the potential defenses and pursued them at trial [rather than advising defendant to plead guilty], Dando would have had a chance to be acquitted altogether." 461 F.3d at 799-800 (emphasis added). In *López-Correa*, the district court reached a similarly stark conclusion: "[i]f the Court had access to these evaluations at the time of sentencing, the Court would have vacated her guilty plea…because, as a victim, a sex slave of Acevedo, she did not have the *mens rea* to commit the offense. Therefore…she is actually innocent." *López-Correa* at *6. In *López-Correa*, the court noted the special circumstances of that case: "[o]riginally, the Court viewed Ms. López-Correa as a criminal, as an aider and abetter in the production of child pornography videos with Joseph Acevedo. Today, with new post-sentence evidence, the Court now sees that she is not a criminal, but rather a victim herself." *Id*. at *5 (original emphasis omitted).

Even if the government meets its evidentiary burden as to the intent element, the government's de minimis electronic evidence against Sharon, which includes several photographs of MV2, would be subject to, and likely fail, the *Dost* test. *See United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986) (as cited in *United States v. Hunter*, No. 16-17205, at \*12 (11th Cir. Dec. 29, 2017). These images do not depict intercourse, bestiality, masturbation, or abuse. The government's only reasonable argument will be that these images depict a "lascivious exhibition of the genitals." *See* 18 U.S.C. § 2256(2)(A). This argument will fail for reasons detailed in Defendant's Objections to Government's Request to Charge. *See* doc. 194.

At the close of evidence, Sharon will ask "the Court [to] conclude, after viewing the evidence in the light most favorable to the government, that a rational jury would have to have entertained reasonable doubt as to the defendant's guilt." *United States v. Bradley*, 428 F. Supp. 2d 1365, 1367 (S.D. Ga. 2006). Even after the Court gives the government "a favorable interpretation of the facts" and also "a most favorable reading of the law," the government's evidence as to the intent element of Counts Seven and Eight will not survive a motion for acquittal. *See id*.

## IV.    CONCLUSION

Nearly three years after initiating its investigation of J.P., the government has achieved its goal of prosecuting a predator. J.P. pled guilty and is due to be sentenced. Despite discovery of substantial evidence suggesting that Sharon is a victim herself, the government has yet to see the case through a different lens. And so, after four days of trial, the jury will be left to deliberate over a handful of images and be asked to determine whether, for example, a candid photograph of Sharon's sister showering, constitutes a depiction of sexually explicit conduct, as required by statute.

United States v. Keegan, et al.
U.S. District Court for the Southern District of Georgia

RESPECTFULLY SUBMITTED this 15th day of April, 2022.

<u>/s/ Dwight T. Feemster</u>
DWIGHT T. FEEMSTER
Georgia Bar Number: 257253
*Attorney for Defendant Keegan*

DUFFY & FEEMSTER, LLC
340 Eisenhower Drive
Suite 800, Second Floor
Savannah, Georgia 31406
(912) 236-6311 Telephone
(912) 236-6423 Facsimile
dwight@duffyfeemster.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I have filed the foregoing Trial Memorandum using the Court's CM/ECF system.

<u>/s/ Dwight T. Feemster</u>
Dwight T. Feemster
*Attorney for Defendant Keegan*